**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE HOUSEHOLDER GROUP LLLP,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>RANDY S. FUSS,<br><br>　　　　Defendant.　　　　　　　／ | No. C 07-573 SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND STRIKE; GRANTING PLAINTIFF LEAVE TO AMEND** |

On June 1, 2007, the Court heard argument on defendant's motion to dismiss and/or strike. For the reasons set forth below, the Court GRANTS in part and DENIES in part defendant's motion, and GRANTS plaintiff leave to amend. Plaintiff shall file an amended complaint no later than **June 15, 2007**.

**BACKGROUND**

Plaintiff The Householder Group LLLP ("Householder"), an Arizona Limited Liability Limited Partnership, filed this action on January 29, 2007 against defendant Randy Fuss, an individual who resides in this District. The complaint alleges that Householder is a "financial planning and investment advisory firm, engaged in the business of selling life insurance, securities, mutual funds and other investment products, and providing related financial, retirement, investment and other advisory and consulting services." Complaint ¶ 6. The complaint alleges that in early 1999, Householder, through its predecessor-in-interest, expended several millions of dollars acquiring assets, proprietary and confidential information and trade secrets from an unrelated California corporation, which included unique and proprietary marketing and consulting methods and practices for use in the financial planning

business. *Id*. ¶ 7.

In August 2003, defendant Fuss contacted Householder seeking a contractual engagement with Householder as a financial services manager. *Id*. ¶ 9. In or about September 2003, Fuss and Householder signed a written contract under which the parties agreed that Fuss would work as an independent contractor for Householder, and that Fuss would establish, develop and operate a Householder branch office in Santa Rosa, California. *Id*. ¶ 11 & Ex. A ("The Householder Group Branch Office Agreement"). Under the agreement, Householder agreed to disclose to and license Fuss to use Householder's proprietary methods, The Householder Group trade name, and to provide training, consulting and support services during the term of the agreement to assist Fuss with the development of the Santa Rosa branch office. *Id*. ¶ 12.

In exchange for the consideration provided by Householder, Fuss agreed to pay Householder a one time consulting fee of $150,000; to keep confidential and to not disclose to any third party or use the Householder "proprietary methods" for Fuss' own benefit and to the exclusion of Householder; to transact all Santa Rosa branch business through Householder and its designated broker-dealer; to split all revenues generated through sales and consulting activity generated by the Santa Rosa branch with Householder in accordance with the revenue sharing arrangement provided by the agreement; and to "buy-out" Householder's interest in the Santa Rosa branch upon termination of the agreement.[1] *Id*. ¶ 13.

On January 13, 2004, the parties signed an "Addendum to Branch Office Agreement" in which Fuss and Householder agreed that during the term of the agreement, payments toward satisfying a $30,000 loan, which Fuss had obtained from Householder's broker-dealer, AIG Financial Advisors ("AIG"), would be deducted from Fuss' share of the revenues generated through the Santa Rosa branch until paid in full. *Id*. ¶ 17 & Ex. B.

On June 30, 2006, prior to completing payment of the $150,000 consulting fee and prior to the expiration of the term of the agreement, and without compliance with the "buy-out" provision of the contract, Fuss gave written notice to Householder of his immediate "resignation" from Householder and

---

[1] The parties dispute whether this provision of the agreement is fairly characterized as a "buy out" or a liquidated damages clause. This issue is discussed *infra*.

2

from his affiliation with AIG. *Id.* ¶ 21. Householder alleges that Fuss "misappropriated some or all of the proprietary and confidential information and trade secrets received from Plaintiff during the contract and caused all of the existing and prospective clients and accounts established through the Santa Rosa branch during the contract to be disclosed and transferred to an unknown third party broker-broker dealer, and to thereafter collect all revenues generated by those existing and new clients and accounts for his own benefit, for the benefit of others and to the exclusion and damage of Plaintiff." *Id.* ¶ 22.

Householder has brought twelve causes of action against Fuss: (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) misappropriation; (5) intentional interference with contracts; (6) negligent interference with contracts; (7) intentional interference with economic relations; (8) negligent interference with economic relations; (9) unfair competition; (10) conversion; (11) accounting and constructive trust; and (12) injunctive relief. Fuss has moved to dismiss a number of the non-contract claims. Fuss also moves to strike various portions of the complaint.

**LEGAL STANDARDS**

**I.    Motion to dismiss**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request

3

to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

### II. Motion to strike

Federal Rule of Civil Procedure 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

## DISCUSSION

### I. Choice of Law

The parties' contract provides that "[t]his AGREEMENT shall be in all respects interpreted, enforced and governed by and under the laws of the State of Arizona." Agreement § XII.H (attached as Ex. 1 to Complaint). The parties do not dispute that Arizona law governs plaintiff's breach of contract claim. Defendant contends that Arizona law also governs plaintiff's non-contract claims. Plaintiff's position is unclear; plaintiff states that there is no reason to adopt a "bright line rule" applying Arizona law to all of plaintiff's claims, yet plaintiff's opposition also largely analyzes whether plaintiff has stated a claim under Arizona law.

In any event, the Court finds that Arizona law governs all of the parties' claims. This Court applies the choice of law rules of California, the forum state of this action. *See Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975); *General Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1505 (9th Cir. 1995), *cert. denied*, 516 U.S. 1146 (1996). In *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992), the California Supreme Court held,

> [A] valid choice-of-law clause, which provides that a specified body of law "governs" the "agreement" between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates.

*Id.* at 470; *see also General Signal Corp.*, 66 F.3d at 1506 (applying *Nedlloyd* to choice of law analysis). Here, there is no dispute about the validity of the agreement's choice of law clause. Further, plaintiff does not dispute that all of plaintiff's claims arise from or are related to that agreement, or the addendum

4

to the agreement. The Court finds that under *Nedlloyd*, Arizona law governs all of the claims alleged in the complaint.

## II.  Breach of fiduciary duty

Defendant moves to dismiss this claim on the ground that the parties' agreement does not create a fiduciary relationship between Fuss and Householder. The agreement provides that Fuss "shall operate and have the status of an independent contractor and is expressly prohibited from acting or operating as either an agent, employee or joint venture with [Householder] . . . Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between the parties." Complaint Ex. A at ¶ I and X.

In *Urias v. PCS Health Systems*, 211 Ariz. 81 (Ariz. App. 2005), the court analyzed whether a parties' contract created a fiduciary relationship between a health care services organization and an insurer. Based on the contract's language stating that the parties were "independent contractors" and that "they shall have no other legal relationship under or in connection with this Agreement" the insurer argued that it was not an agent, trustee or fiduciary, and that its obligation to the health care services organization was "a simple contractual one of debt." *Id.* at 85. The court agreed:

> Rather than creating a fiduciary relationship, the Agreement created a contractual arrangement whereby PCS agreed to perform services and Premier agreed to pay for those services. *See In re Koreag*, 961 F.2d 341, 353 (2nd Cir. 1992) ("Purely commercial transactions do not give rise to a fiduciary relationship."). A commercial contract creates a fiduciary relationship only when one party agrees to serve in a fiduciary capacity. *See Morgan v. Am. Fid. Fire Ins. Co.*, 210 F.2d 53, 54-56 (8th Cir. 1954) (holding that agent of insurer held collected premiums in a fiduciary capacity because agency agreement stated that agent was to receive and hold premiums "in a fiduciary capacity as trustee for" the insurer); *see also Am. Nat'l Bank v. Nat'l Indem. Co.*, 222 F.2d 513, 516-17 (8th Cir. 1955) (finding express trust created when parties used language "[a]ll moneys . . . shall be held by . . . the agent as a fiduciary trust for and on behalf of the Company"). The Agreement between PCS and Premier specified that the parties were independent contractors and did not purport to create a fiduciary relationship. If Premier had intended to create a fiduciary relationship, it could have negotiated for specific language in the Agreement to that effect. The Agreement does not contain such language.

*Id.* at 87.

Here, as in *Urias*, the parties' commercial contract explicitly provides that defendant is an independent contractor, and prohibits defendant from acting in a joint venture or as an agent or

5

employee of Householder. Notwithstanding this language, Householder argues that the contract created a fiduciary duty because Householder entrusted Fuss with confidential and proprietary information. However, the cases cited by Householder are inapposite, and none of them involve the situation presented here where the parties' contract – which was drafted by plaintiff – explicitly states that the defendant is an independent contractor, and does not contain any language creating a fiduciary relationship. *See, e.g.*, *Taeger v. Catholic Family and Community Servs.*, 196 Ariz. 285 (Ariz. App. 1999) (adoptive parents brought claim against adoption agency and diocese for failure to disclose medical information about biological mother; existence of fiduciary duty is question of fact for jury); *Rhoads v. Harvey Pubs. Inc.*, 145 Ariz. 142 (Ariz. App. 1984) (finding no confidential relationship between cartoonist and publisher where cartoonist was independent contractor who thought he was employee; noting that "the doctrine of confidential relations has been applied to husband and wife, parent and child, guardian and ward, attorney and client, partners, and joint adventurers"); *Herz & Lewis, Inc. v. Union Bank*, 22 Ariz. App. 437, 439 (1974) (no confidential relationship between jeweler and its bank and bank's agent).

Accordingly, the Court dismisses this claim without leave to amend.

### III. Breach of implied covenant of good faith and fair dealing

Defendant moves to dismiss this claim on the ground that Arizona law only permits a tort claim in limited circumstances involving a "special relationship" between the parties, which defendant contends is not present here.[2] In *Sutter Home Winery v. Vintage Selections*, the Ninth Circuit analyzed Arizona law and stated, "[o]rdinarily, a party claiming breach of an implied covenant is limited to a contract action. In certain situations, however, the breach of the implied covenant may provide the basis for imposing tort damages. Arizona courts allow a plaintiff to bring a tort action only where a special relationship exists between the parties arising from elements of public interest, adhesion, and fiduciary responsibility." 971 F.2d 401 (9th Cir. 1992) (internal citations and quotations to Arizona case law

---

[2] At the hearing, plaintiff's counsel stated that although this cause of action is pled as a contract claim, plaintiff could bring this claim in tort. As such, the Court will address the parties' contentions regarding whether plaintiff can plead the elements of such a tort claim.

6

omitted). The court continued,

> In *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986), the Arizona Supreme Court identified two situations where this "special relationship" exists. First, tort damages are available where "the type of contract involved is one in which the plaintiff seeks something more than commercial advantage or profit from the defendant." *Id*. 726 P.2d at 575. The paradigm example is an insurance contract in which the insured is contracting primarily for security. *Id*. Second, tort damages are available where restricting recovery to contract damages would "provide[ ] more of an incentive for breach of the contract than for its performance." *Id*. at 576.

*Id*. In *Sutter Home*, which involved claims between a wine supplier and a distributor for breach of a distributor agreement, the Ninth Circuit found that neither special relationship existed. First, the court found that both parties were sophisticated business entities who entered their relationship intent on earning profits. *Id*. Second, the court held that there was no reason to believe that restricting a distributor's recovery to contract damages would encourage suppliers to routinely breach distributor agreements. *Id*.

Defendant argues that there is no special relationship here because Householder structured the agreement to make defendant an independent contractor and not a fiduciary, the parties entered their relationship for purely commercial reasons, and the only damages plaintiff seeks under this claim are the same contract damages alleged under the breach of contract claim.[3]

Plaintiff argues that the "covenant of confidentiality and plaintiff's performance" create the special relationship necessary to maintain this cause of action as a tort claim. Plaintiff does not cite any authority for this proposition, and the fact that Fuss is not a fiduciary undercuts this contention. Plaintiff relies on *Bike Fashion Corporation v. Kramer*, 202 Ariz. 420 (Ariz. App. 2002), which simply holds that a party can breach the implied covenant of good faith and fair dealing even where there is an express contract term relating to the same subject. *Id*. at 425. *Bike Fashion* does not address what factors are necessary to create a "special relationship," which is the question presented here.

The Court concludes that under *Sutter Home*, there is no "special relationship" between the parties to allow for a tort claim for breach of the implied covenant of good faith and fair dealing.

---

[3] Under both causes of action, plaintiff seeks "foreseeable and actual damages in the sum of $78,147.20 plus interest on the unpaid portion of the consulting fee; for nonpayment of the buy-out provision . . . in the amount of $234,193.80, and for general, special and consequential damages, including but not limited to loss of past and future profits in an amount not yet ascertained but estimated to be $500,000.00." Complaint ¶¶ 35, 41.

7

Defendant was an independent contractor, plaintiff is a sophisticated business entity, and the parties entered the relationship to create a profit and not for some non-economic reason. Accordingly, the Court will allow plaintiff's claim to proceed as a contract claim, but plaintiff may not allege a tort claim for breach of the implied covenant of good faith and fair dealing.

### IV. Intentional interference with contract

"To establish a *prima facie* claim for tortious interference with contract, a plaintiff must show the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted." *Miller v. Hehlen*, 209 Ariz. 462, 471 (Ariz. App. 2005) (internal citations and quotations omitted).

The complaint alleges that between September 2003 and June 2006, Householder had a valid and existing contractual relationship with numerous clients who purchased insurance, retirement, and investment products and services through the Santa Rosa Branch, that Fuss knew of these relationships, and that Fuss "intentionally caused numerous existing clients and accounts to be transferred from Plaintiff and AIG to a different broker-dealer for the specific purpose of interfering with Plaintiff's realization of the benefits to which they were entitled under those contractual relationship[s] . . . ." Complaint ¶¶ 61-63.

Defendant moves to dismiss this claim because (1) plaintiff has not attached any of the alleged contracts to the complaint; (2) by plaintiff's own admission, the alleged contractual relationship was "terminable" since defendant caused the accounts to be "transferred" from AIG to a different broker-dealer; (3) plaintiff has not alleged that it "gave" any of the underlying customers to defendant; defendant asserts that he obtained all of the underlying clients through his own hard work; and (4) there is nothing in the parties' agreement that states that Householder owns an interest in the customers that Fuss obtained.

The Court finds that there is no requirement that plaintiff attach the contracts at issue to the complaint, and that plaintiff has sufficiently alleged this cause of action. The complaint alleges that

1 Householder had a financial interest in the customers defendant obtained, *see* complaint ¶ 61, and that 2 but for defendant's actions, those customers would have remained with Householder and AIG. 3 Defendant's arguments about the precise nature of the contracts at issue and about whether defendant 4 acted improperly, are factual matters that go to the merits of plaintiff's claim. *See generally Miller*, 209 5 Ariz. at 470-71.

### V. Negligent interference with contract and prospective economic advantage

Defendant moves to dismiss plaintiff's claims for negligent interference with contractual relationships and prospective economic advantage because these claims are not recognized under Arizona law. *Cf. Phoenix Prof. Hockey Club, Inc. v. Hirmer*, 108 Ariz. 482, 483 (Ariz. 1972) ("To protect a contractual interest from negligent interference would place an undue burden on freedom of action and could impose a severe penalty on one guilty of mere negligence.").

Plaintiff does not cite any Arizona authority allowing for such negligence claims, and the Court was unable to locate any. Instead, plaintiff asserts that the Court should apply California to these two claims, either solely or as some sort of "blend" with unspecified Arizona law. As discussed *supra*, the Court finds that Arizona law applies to plaintiff's non-contract claims to the extent that those claims arise out of or relate to the parties' contract; the negligent interference claims clearly arise out of or relate to the parties' contract, and thus Arizona law governs. Because *Phoenix Professional Hockey Corporation* strongly suggests that such claims are not allowed under Arizona law, and because plaintiff has not cited any Arizona authority to the contrary, the Court dismisses these claims without leave to amend.[4]

### VI. Conversion

The complaint alleges that Householder is the owner of and entitled to possession of "all monies,

---

[4] *Phoenix* involved a claim by a professional hockey club whose goalie was injured in an automobile accident allegedly caused by the defendant. The club sought its out-of-pocket expenses in hiring and employing a substitute goalie during the remainder of the goalie's contract. The Arizona Supreme Court affirmed the trial court's dismissal of the claim, holding that a complaint for compensatory damages by an employer against a person negligently injuring its employee did not state a cause of action.

9

funds, client information, prospect information, and accounts and all proprietary information, trade secrets and assets belonging to Plaintiff as provided by the contract, both tangible and intangible, to which Fuss obtained access to during the term of the Contract . . . ." Complaint ¶ 92. The complaint also alleges that in June 2006, Fuss wrongfully transferred and diverted proprietary and confidential information and trade secrets belonging to Householder, and seeks the return of "all confidential and proprietary information, client accounts, monies, funds, and prospect information wrongfully diverted and transferred" to Fuss and others. *Id*. ¶¶ 93-94.

Defendant moves on the ground that Arizona law precludes a claim of conversion of intangible property. Arizona has adopted the following definition of conversion, which is in the Restatement (Second) of Torts § 222A(1) (1965): "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *See Focal Point, Inc. v. U-Haul Co. of Ariz.*, 155 Ariz. 318, 319 (App. 1986). "An action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document." *Miller*, 209 Ariz. at 472. In *Miller*, the appellate court affirmed a trial court's grant of summary judgment on a conversion claim. The court first strongly suggested that a customer list in and of itself is not usually subject to a conversion claim: "Miller did not allege that Hehlen took a customer list in the form of a single, unified document that had value as tangible property. Nor does a customer list constitute intangible property merged with a document in the same sense as a stock certificate or an insurance policy. Thus, neither rationale supports a claim of conversion based on taking a customer list." *Id*. The *Miller* court also held that "the record does not establish that Hehlen exercised intentional dominion or control over the customer list in such a way that he interfered with Miller's rights to the extent that he should be required to pay the full value of the list, whatever that might be."

The Court GRANTS defendant's motion to dismiss this claim with leave to amend. If plaintiff chooses to amend, plaintiff shall be guided by *Miller* and plead, if able, conversion of tangible property, or "intangible property that is merged in, or identified with, some document." *Miller*, 209 Ariz. at 472.

**VI.  Constructive trust and injunctive relief**

10

Defendant moves to strike these claims on the ground that they are not claims, but forms of relief. Plaintiff concedes that these two "claims" are actually remedies, and stated at the hearing that it pled these forms of relief as "claims" in order to put defendant on notice that plaintiff was seeking a constructive trust and injunctive relief. The Court agrees with defendant that, in the interest of maintaining orderly pleadings and properly framing the issues for motion practice, plaintiff should replead these "claims" in the prayer for relief.

**VII. Liquidated damages**

Defendant moves to strike the liquidated damages provision – referred to as the "buy-out" provision by plaintiff – from the parties' agreement as unenforceable as a matter of Arizona law. The Court finds that defendant's motion on this point is premature, as Arizona courts have emphasized the factual nature of the inquiry. *See Larson-Hegstrom & Associates, Inc. v. Jeffries*, 145 Ariz. 329, 333-34 (Ariz. App. 1985) (reviewing evidence from bench trial to evaluate enforceability of liquidated damages clause). Although defendant's arguments may be well-founded, the Court finds that the question of whether the liquidated damages clause is enforceable is not suitable for resolution on the pleadings. Defendant may renew these arguments, supported by an adequate factual record, in a motion for summary judgment.

Relatedly, defendant moves to strike allegations regarding the "buy-out" provision in the complaint. Defendant simply disputes plaintiff's characterization of this provision; this is a factual matter that should be resolved by the fact finder.

**VIII. Paragraph 10 of the complaint**

Defendant moves to strike paragraph 10 of the complaint, which states that when Fuss first contacted Householder, Fuss "represented to plaintiff that he held a series 7 securities license . . . and was seeking affiliation with a larger organization in sales management." Plaintiff responds that these allegations are foundational and goes to defendant's level of sophistication when he entered into the agreement. The Court agrees with plaintiff that these allegations are not irrelevant, and DENIES defendant's motion to strike this paragraph.

11

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS in part and DENIES in part defendant's motion to dismiss and/or strike. (Docket No. 13).

**IT IS SO ORDERED.**

Dated: June 4, 2007

SUSAN ILLSTON
United States District Judge