1

2

3

4

5                      IN THE UNITED STATES DISTRICT COURT

6               FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   THE HOUSEHOLDER GROUP,           No. C 07-573 SI

9          Plaintiff,            **ORDER GRANTING IN PART AND**
                                        **DENYING IN PART PLAINTIFF'S**

10    v.                          **MOTION FOR PARTIAL SUMMARY**
                                        **JUDGMENT; GRANTING**

11   RANDY S. FUSS,               **DEFENDANT'S MOTION FOR PARTIAL**
                                      **SUMMARY JUDGMENT**

12          Defendant.

13   _____/

14        On July 18, 2008, the Court heard argument on the parties' cross-motions for partial summary

15  judgment.  For the reasons set forth below, the Court GRANTS in part and DENIES in part plaintiff's

16  motion, and GRANTS defendant's motion.

17

18                                **BACKGROUND**

19        Plaintiff The Householder Group ("THG"), an Arizona Limited Liability Limited Partnership,

20  filed this action on January 29, 2007 against defendant Randy Fuss.  The complaint alleges that THG

21  is a "financial planning and investment advisory firm, engaged in the business of selling life insurance,

22  securities, mutual funds and other investment products, and providing related financial, retirement,

23  investment and other advisory and consulting services."  First Amended Complaint ¶ 6.

24        In June 2003, defendant Fuss met with representatives from THG to explore the possibility of

25  working with THG.  Fuss Decl. ¶¶ 2-4.  Defendant decided to join THG, and on July 10, 2003, he signed

26  an "Associate Confidentiality" agreement, which states in relevant part:

27        The undersigned ASSOCIATE agrees to keep confidential and not to use or to disclose
            to others either during or after the term of his/her association the confidential

28        technology, computer software, proprietary information, customer lists, trade secrets,

United States District Court

For the Northern District of California

1    marketing and/or seminar materials, which he/she gains knowledge of through his/her
2    association with THG except for any use or disclosure in the ordinary course of business
     during the term of his/her employment.

3    Pl's Ex. 1.

4    Between July and September 2003 defendant engaged in a number of tasks on behalf of
5    Householder.  These tasks included participating in conference calls, travel, leasing and furnishing
6    office space, forming an S-corporation, memorizing the THG seminar script, reviewing and
7    familiarizing himself with brokerage operations, recruiting and hiring an employee, and transferring
8    securities and insurance licenses to SunAmerica Securities.  Fuss Decl. ¶ 6.  Defendant estimates that
9    he spent approximately 350 hours and $ 41,000 of his own money to complete those tasks.  *Id.* ¶ 7.

10   In September 2003, THG flew defendant to Arizona for a mock sales presentation referred to
11   as a "dry run" seminar.  *Id.* ¶9.  The two day event included a number of agenda items, the bulk of which
12   was operations training and delivering a final dress rehearsal of the seminar.  *Id.* ¶ 10.  Defendant states
13   that during a one hour meeting with Todd Bergeron, THG's Executive Vice President, Mr. Bergeron
14   informed defendant for the first time that he was required to sign a Branch Office Agreement ("BOA")
15   in order to affiliate with THG as a branch manager.  *Id.* ¶ 11.  Defendant signed the BOA, under which
16   the parties agreed that defendant would work as an independent contractor for THG, and that defendant
17   would establish, develop and operate a THG branch office in Santa Rosa, California.  Pl's Ex. 9.  Under
18   the agreement, THG agreed to disclose to and license defendant to use THG's proprietary methods, The
19   Householder Group trade name, and to provide training, consulting and support services during the term
20   of the agreement to assist defendant with the development of the Santa Rosa branch office.  *Id.*

21   Several of the BOA's provisions are relevant to analyzing the instant motions.  Section III of the
22   BOA, "Consulting Services and Marketing Systems," states that the "services and intellectual property
23   to be provided by THG . . . are of very significant value," and that "[t]he normal time period required
24   for recoupment of the investment made by THG is thirty-six months during which THG will suffer
25   losses occasioned by its forbearance in associating with other revenue producing investment advisors
26   in the Branch Office area."  *Id.* at 3.  The BOA further provides that "[a]s payment for the services
27   provided Manager by THG," Fuss agreed to pay Householder a "one time fee" of $150,000; both parties
28   refer to this as the "Integration Fee."  *Id.*

The BOA also contains several provisions related to confidentiality.  One provision, "Proprietary and Confidential Information An[d] Use of Name," states, *inter alia*,

> The Manager agrees to keep confidential and not to use or to disclose to others, except his or her employees and Registered Representative assistants, either during or after the term of this AGREEMENT, the proprietary information, customer or prospect lists, computer database, marketing and/or seminar materials or other trade secrets which he/she gains knowledge of through the Manager's association with THG, or the Related Entities . . . .

*Id*.  Another provision, "Prohibited Uses and Damage From Uses of Certain Proprietary Information," states, *inter alia*, "Manager shall not, either directly or indirectly, either for himself/herself or any other person, corporation, firm, partnership or other entity, employ or utilize any of the proprietary information or trade secrets of THG for any purpose whatsoever."  *Id*. at 4.

The BOA states that the term of the agreement is three years, "but it shall automatically be renew[ed] for succeeding periods of one year" unless either party provides timely written notification as specified in the BOA.  *Id*. at 6.  The BOA also contains a liquidated damages clause, which provides in relevant part:

> Upon the termination of this AGREEMENT by Manager, Manager shall immediately pay to THG, as liquidated damages, a sum of money which is equal to sixty percent (60%) of the Manager's Gross Revenue generated during the last full year of this AGREEMENT.

*Id*.

On January 13, 2004, the parties signed an "Addendum to Branch Office Agreement" in which Fuss and THG agreed that during the term of the agreement, payments toward satisfying a $30,000 loan, which Fuss had obtained from Householder's broker-dealer, AIG Financial Advisors ("AIG")[1], would be deducted from Fuss' share of the revenues generated through the Santa Rosa branch until paid in full.  FAC ¶ 17 & Ex. B.

On June 30, 2006, prior to completing payment of the $150,000 integration fee and prior to the expiration of the term of the agreement, defendant gave written notice to THG of his immediate "resignation" from THG and from his affiliation with AIG.  *Id*. ¶ 22.  At that time, the Santa Rosa office

---

[1]   The loan was originally issued by SunAmerica Securities ("SAS").  SAS was acquired by AIG Financial Advisors, Inc. ("AIGFA") in October 2005; the parties' papers refer to both SAS and AIGFA.

United States District Court
For the Northern District of California

3

1   had 118 customers, all of whom had been acquired while defendant was associated with THG.  At some

2   point around defendant's departure from THG, defendant sent a letter to all of the Santa Rosa THG

3   customers informing them of his departure and soliciting their business.  The letter stated,

> Dear _____,
>
> For quite a while I have been researching other independent broker dealers and comparing the quality of their broker support services with The Householder Group, AIG Financial Advisors and Pershing.  I am pleased to announce that effective immediately I have changed broker dealers to Linsco/Private Ledger (LPL) and changed the name of our financial practice to Fuss Financial Group.  Areas of significant improvement include client statements, online client access, tax reporting, technology and, for myself, greater access to research tools and support needed to manage your accounts more effectively.
>
> Enclosed are all the forms needed to transition your accounts to Linsco/Private Ledger.  Please sign and return in the envelope provided.  If you have any questions or would like to schedule an appointment to discuss these changes, please do not hesitate to call Melissa, Troy or myself.  All of our contact information will remain the same. We are excited about this new support and look forward to servicing your financial needs for many years to come.

13   Pl's Ex. 8.  In response to defendant's solicitation, 115 of the 118 customers switched their accounts to

14   Fuss Financial Group and Linsco/Private Ledger.  Pl's Ex. 3 (Fuss Depo. at 98:1-10); Ex. 5 (response

15   to Interrogatory No. 9).

16   Defendant has submitted a declaration stating that THG never provided him with a "customer

17   list."  Fuss Decl. ¶ 15.  Instead, defendant states that THG advised him to obtain customer prospect

18   information from a third-party direct mail provider named Response Mail.  *Id.* ¶ 13.  Defendant states

19   that THG representatives informed him that Response Mail would provide him with a list of high net

20   worth individuals in the Santa Rosa area.  *Id.*  Defendant states that after joining THG, he stopped

21   paying and using Response Mail because he concluded that Response Mail's prospect lists did not

22   include adequate numbers of high net worth potential clients, and he also found the service was of poor

23   quality.  *Id.* ¶ 14.  Defendant has also submitted a declaration from the CEO of Response Mail which

24   states that the information defendant obtained from Response Mail was not THG proprietary

25   information, and that anyone could purchase the lists by paying the appropriate fee.  *See* Panaggio Decl.

26   Defendant started using another direct mail vendor, Treat Designs.  Fuss Decl. ¶ 14.  Defendant paid

27   all costs charged by both Response Mail and Treat Designs, and was never reimbursed for THG for

28   these expenses.  *Id.*  Defendant paid in excess of $215,000 on the mailing lists and the seminar facilities.

United States District Court
For the Northern District of California

4

1  *Id.*

2  Defendant also states that shortly after affiliating with THG he stopped using portions of the

3  THG Retirement Seminar and the THG sales process scripts.  *Id.* ¶ 16.  Defendant states that he

4  eliminated and/or made modifications to certain seminar slides and made modifications to the sales

5  process.  *Id.*  Defendant states that it was only after making these modifications that he began to grow

6  his business.  *Id.* ¶ 17.  Defendant states that when he sent the letter quoted above, he "never used any

7  information from any THG client database or list."  *Id.* ¶ 18.  After leaving THG, defendant sold his

8  client base to a broker at defendant's new firm.  *Id.* ¶ 19.

9  THG alleges six causes of action in the first amended complaint: (1) breach of contract; (2)

10  breach of implied covenant of good faith and fair dealing; (3) misappropriation; (4) intentional

11  interference with contracts; (5) intentional interference with economic relations; and (6) unfair

12  competition.  THG seeks, *inter alia*, $78,147.20 (the unpaid balance on the Integration Fee); liquidated

13  damages in the amount of $234,193.80, or alternatively for actual, general, special and consequential

14  damages, including but not limited to loss of past and future profits in an amount not yet determined but

15  in excess of $152,226.00; exemplary and punitive damages; a constructive trust against all revenues

16  generated by defendant as a result of wrongful conduct; a disgorgement of profits; an accounting; and

17  other injunctive relief.

18  Defendant has alleged six counterclaims: (1) breach of contract; (2) breach of the implied

19  covenant of good faith and fair dealing; (3) fraud; (4) fraudulent inducement; (5) unfair competition and

20  deceptive practices; and (6) declaratory relief – Branch Office Agreement.  Fuss alleges that THG made

21  false statements to Fuss to induce him to sign the BOA, and thus that the BOA is voidable as a matter

22  of law. Fuss also alleges that the BOA is an adhesion contract, and that the liquidated damages clause

23  is unenforceable.  Fuss seeks, *inter alia*, damages in excess of $250,000, and declaratory relief.

24  The parties have filed cross-motions for partial summary judgment.  THG seeks summary

25  judgment on its misappropriation claim and partial summary judgment on its breach of contract claims,

26  and defendant seeks a declaration that the liquidated damages clause is unenforceable.

27

28  **LEGAL STANDARD**

1    Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories,

2    and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

3    material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

4    56©.

5    In a motion for summary judgment, "[if] the moving party for summary judgment meets its

6    initial burden of identifying for the court those portions of the materials on file that it believes

7    demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so

8    that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts

9    showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors*

10   *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  In

11   judging evidence at the summary judgment stage, the Court does not make credibility determinations

12   or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving

13   party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

14   *Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).  The evidence

15   presented by the parties must be admissible. Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony

16   in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary

17   judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

18

19                                    **DISCUSSION**

20   **I.    Plaintiff's motion for partial summary judgment**

21   THG moves for summary judgment on its claim for misappropriation of trade secrets, and for

22   partial summary judgment on its breach of contract claim for defendant's failure and refusal to pay the

23   outstanding balance of $78,147.20 on the Integration Fee, as well as the unpaid loan of $30,000.

24

25          **A.    Misappropriation**

26   Plaintiff moves for summary judgment on its claim that defendant misappropriated THG's trade

27   secrets, namely THG's customer list.  Defendant contends that THG's customer list is not a trade secret

28   under Arizona law because, according to defendant, THG did not participate in the creation of the

1   customer list.

2          Arizona has adopted the Uniform Trade Secrets Act ("UTSA").  The Arizona Trade Secrets Act

3   defines "trade secret" as follows:

4          (4) "Trade secret" means information, including a formula, pattern, compilation,
           program, device, method, technique or process, that both:
5
6          (a) Derives independent economic value, actual or potential, from not being generally
           known to, and not being readily ascertainable by proper means by other persons who can
           obtain economic value from its disclosure or use.
7
           (b) Is the subject of efforts that are reasonable under the circumstances to maintain its
8          secrecy.

9   A.R.S. § 44-401.  Arizona also recognizes the Restatement of Torts in the absence of controlling

10  authority. *See Enterprise Leasing Co. v. Ehmke*, 197 Ariz. 144, 148 (Ct. App. 1999).  The Restatement

11  of Torts states that a "list of specialized customers" can constitute a trade secret.  Rest. Torts § 757 cmt.

12  b (2008).  The Restatement of Torts also states,

13         Some factors to be considered in determining whether given information is one's trade
           secret are: (1) the extent to which the information is known outside of his business; (2)
14         the extent to which it is known by employees and others involved in his business; (3) the
           extent of measures taken by him to guard the secrecy of the information; (4) the value
15         of the information to him and to his competitors; (5) the amount of effort or money
           expended by him in developing the information; (6) the ease or difficulty with which the
16         information could be properly acquired or duplicated by others.

17  *Id.*

18         The Court finds that while it is a close question, there are issues of fact precluding summary

19  judgment on plaintiff's misappropriation claim.  In particular, the Court finds that there are disputes of

20  fact regarding "the amount of effort or money expended by [THG] in developing the information," as

21  opposed to the amount of effort and money expended by defendant.  *Id.*  Thus, while the Court agrees

22  with plaintiff that a customer list can constitute a trade secret, the Court finds it is not clear that the

23  customer list here is a THG trade secret.  None of the cases cited by the parties address a situation where

24  the customer list or other alleged trade secret was created and developed entirely[2] by the employee.  *See*

25  *Enterprise Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144 (Ct. App. 1999) (trade secrets consisted of

26  confidential documents comprising Enterprise's strategic plans, programs, methods and approaches);

27  _____

28         [2] On plaintiff's motion for summary judgment, the Court is required to draw all inferences in
       favor of defendant.

United States District Court
For the Northern District of California

7

*Morlife Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997)[3] (customer list developed by company over period of years was trade secret); *American Credit Indemnity Co. v. Sacks*, 213 Cal. App. 3d 622, 636-37 (1989) (customer list developed by both company and employee was trade secret).  The additional case cited by plaintiff at oral argument, *Al Minor & Associates, Inc. v. Martin*, 117 Ohio St. 3d 58 (2008), only addressed the question of whether a customer list compiled by a former employee strictly from memory of the employer's operations can be the basis for a statutory trade secret violation.

Accordingly, the Court DENIES summary judgment on this claim.

### B.    Unpaid balance on Integration Fee

Defendant contends that summary judgment is inappropriate because there are numerous factual questions surrounding his affirmative defenses of fraudulent inducement and economic duress.  With regard to fraudulent inducement, defendant asserts that THG representatives falsely represented the effectiveness of the THG sales seminar and script, and the value of the THG sales process.

Defendant also contends that he signed the BOA as a result of economic duress.  Defendant notes that THG first presented him with the BOA in early September 2003, almost nine weeks after he had decided to join THG as an independent contractor and after he had spent close to 350 hours and $41,000 of his own money preparing for his new position.  Fuss Decl. ¶¶ 5-7, 9.  Defendant had also signed a three year lease for office space, and a three year lease for computer equipment.  *Id.* ¶ 8.  Defendant states that it was during the two-day "dry run" seminar in September 2003 that he was first informed by Mr. Bergeron that he was required to sign a branch office agreement in order to affiliate with THG as a branch manager.  *Id.* ¶ 11.  "This was the first time I was told that I needed to sign this agreement, and no one at THG had previously mentioned any aspect of this agreement to me."  *Id.*  Defendant also asserts that there are questions of fact regarding the value of the $150,000 Integration Fee.

The Court finds that defendant has raised disputed issues of fact on his affirmative defenses to plaintiff's breach of contract claims, and thus that summary judgment is inappropriate.

---

[3] California has also adopted the Uniform Trade Secrets Act, and thus this Court finds California cases instructive.

**C.      $30,000 loan**

Plaintiff moves for summary judgment on a non-forgivable loan made by SunAmerica Securities, Inc. ("SAS") to defendant on October 10, 2003.   THG has submitted the declaration of Scott Householder, CEO of THG, which states that THG arranged with SAS to make the $30,000 loan to defendant, and that THG guaranteed payment of the loan.  Pl's Ex. 6 ¶ 10.  Householder states that defendant did not repay that loan, and that THG repaid that amount, plus interest, to SAS.  *Id*.  THG has also submitted the declaration of Jimi Smith of AIGFA, which states that defendant did not pay any of the $30,000 loan, that THG guaranteed the loan, and that THG paid the entire balance.  Pl's Ex. 7 ¶ 6.

Defendant raises a pleading objection to this claim, arguing that plaintiff did not separately plead a cause of action based on the $30,000 loan, and the complaint does not specifically seek repayment of the $30,000.  The Court finds this argument lacks merit, as the matter of the $30,000 loan was alleged in the original and amended complaints, albeit not as a separate cause of action.  FAC ¶ 17.  Thus, defendant has been on notice since the inception of this lawsuit that the unpaid $30,000 loan was at issue.  As a pleading matter, plaintiff is directed to file an amended complaint which specifically seeks damages related to this loan.

Defendant also asserts that THG has not shown that it was harmed by any failure to repay the loan to SAS/AIGFA.  However, defendant has not submitted any evidence to rebut the Householder or Smith declarations which both state that SAS loaned defendant $30,000, that THG guaranteed the loan, that defendant did not repay the loan, and that as a result THG repaid the entire loan, plus interest.

Accordingly, the Court GRANTS summary judgment in favor of plaintiff on this issue, with the amount of damages subject to proof.[4]

**II.      Defendant's motion for partial summary judgment**

Defendant moves for summary judgment on the issue of whether the liquidated damages clause

---

[4] Defendant suggests that under the terms of the loan agreement and addenda, THG's damages in the event of non-payment were less than $30,000 because THG agreed to obtain an increased pay-out until the note is paid.  This contention goes to the amount of damages, and thus at trial defendant may present evidence contesting the amount of damages related to this loan.  However, defendant has not submitted any evidence disputing that he did not repay the $30,000 loan, and that THG repaid the loan on defendant's behalf.

United States District Court
For the Northern District of California

is enforceable under Arizona law. "[A]n agreement made in advance of a breach is a penalty unless both of two conditions are met. First, the amount fixed in the contract must be a reasonable forecast of just compensation for the harm that is caused by any breach. Second, the harm that is caused by any breach must be one that is incapable or very difficult of accurate estimation." *Pima Savings & Loan Ass'n v. Rampello*, 168 Ariz. 297, 300 (Ct. App. 1991).

The relevant portion of the contract provides:

**Term**. The term of this Agreement shall be for a period of 3 years but it shall automatically be renew[ed] for succeeding periods of one year unless written notification is given by one of the parties to the other party not more than 60 days and not less than 30 days prior to its expiration. This AGREEMENT shall not become a binding contract until it is executed by all parties appearing on the signature page, and will be deemed effective as of the date of the signature page, unless and to the extent a specific provision of this AGREEMENT refers to a different effective date. This AGREEMENT shall supersede any and all previous agreements between THG and Manager.

**Termination**. Upon the termination of this AGREEMENT by Manager, Manager shall immediately pay to THG, as liquidated damages, a sum of money which is equal to sixty percent (60%) of the Manager's Gross Revenue generated during the last full year of this AGREEMENT.

THG reserves the right to terminate this AGREEMENT without notice upon the occurrence of any of the following items:

A. A violation of the terms and conditions of this AGREEMENT by the Manager.
B. A good faith determination by THG that the Manager has acted in such a manner as to significantly and adversely affect the marketability or reputation of THG or its Related Entities;
C. Failure of the Manager to comply with any applicable laws or regulations governing any activity performed under this AGREEMENT;
D. Conviction of the Manager of any crime involving moral turpitude;
E. Death of the Manager.
F. Termination of Manager as a Registered Representative by SunAmerica Securities (or such other broker-dealer with whom THG becomes affiliated).

BOA at 6.

Defendant argues that the liquidated damages clause is unenforceable because the liquidated damages do not bear any relationship to the breach. Defendant notes that the terms of the clause apply to any manager who terminates the agreement, regardless of when the termination occurs and under any circumstances. Defendant also has submitted evidence that some individuals refused to sign agreements, or signed agreements with no liquidated damages clause or with modified liquidated damages clauses. Zussman Decl. Ex B (Householder Depo. at 137:24-25; 168:5-169:11); Ex. C

10

(Bergeron Depo. at 114:14-115:25).[5]  Defendant argues that if the liquidated damages provision is premised on an assumption that the breach occurs upon the termination of the contract, then all managers should be required to sign the BOA containing the liquidated damages clause.

THG defends the clause on a several grounds, none of which have merit.  First, THG argues that the liquidated damages provision compensates THG for the cost of training managers as well as the pro rata cost of supporting the activities of the financial advisors affiliated with THG.  As defendant correctly notes, those costs are presumably compensated in the $150,000 Integration Fee charged to managers (and separately at issue in this case).  The BOA states that the $150,000 one-time fee is in exchange for "services and intellectual property" provided by THG to the manager.  If the liquidated damages are also intended to compensate for these costs, the liquidated damages are not a reasonable forecast of damages.

Second, THG argues that the liquidated damages formula is a reasonable forecast of the damage caused by a breach when a manager takes a customer list upon termination.  However, the plain language of the liquidated damages clause is not limited to circumstances when a manager terminates employment and takes a THG customer list.  Instead, the liquidated damages clause applies anytime a manager terminates the agreement, regardless of the reason for the termination or whether the manager takes a customer list upon departure from THG.  To the extent that THG suggests that it must enforce the liquidated damages clause to recoup losses associated with defendant's alleged misappropriation of the customer list, plaintiff can recover for those losses under the Arizona Trade Secrets Act if it prevails on that claim.

---

[5]  Citing a portion of Mr. Bergeron's deposition, plaintiff asserts that no person has become a manager of an HG branch office who did not sign a Branch Office Agreement.  However, in the portion of the deposition cited by plaintiff, Mr. Bergeron simply stated, "Nobody was required to sign the Branch Office Agreement.  The Branch Office Agreement gave – there is a difference between the rep agreement and the Branch Office Agreement.  And to get the benefits of the Branch Office Agreement required you to have a Branch Office Agreement.  To get the benefits of a rep agreement, you just had to have a rep agreement."  Pl's Ex. 13 (Bergeron Depo. at 36:16-22).  Mr. Bergeron did not testify that every branch manager signed a BOA, or more importantly, that every branch manager signed a BOA containing a liquidated damages clause.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part plaintiff's motion for partial summary judgment, and GRANTS defendant's motion for partial summary judgment. (Docket Nos. 56 & 57). In order to conform the pleadings, plaintiff shall file an amended complaint which specifically seeks relief related to the unpaid $30,000 loan no later than **August 15, 2008**.

**IT IS SO ORDERED.**

Dated: July 22, 2008

_____
SUSAN ILLSTON
United States District Judge